FILED

02 OCT 29 AH 10: 39

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CATHERINE DAVID,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Case No. CV 00-TMP-1826-S
                                    )
MIDLAND MORTGAGE COMPANY,           )
INC., and MIDFIRST BANK, INC.,      )
                                    )        **ENTERED**
            Defendants.             )
                                             OCT 29 2002

## MEMORANDUM OPINION

This cause is before the court on the motions for summary judgment filed by the defendants, MidFirst Bank, Inc. ("MidFirst") and Midland Mortgage Company, Inc., ("MMC") on April 4, 2002. The two motions were supported by a joint evidentiary submission filed April 4, 2002, and a memorandum of fact and law submitted by MMC on April 11, 2002. The plaintiff, Catherine David, filed a brief in opposition to the motions for summary judgment on May 8, 2002, and defendants filed reply briefs on May 20, 2002. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). Accordingly, the court enters this memorandum opinion.

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment

42

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc.

v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than

show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations

omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must

be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S.

at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless,

credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all

justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City

of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

3

## II.  FACTS

Applying the standards described above, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to the non-moving plaintiff.

All of plaintiff's claims arise from her mortgage loan.  Prior to July 1998, plaintiff paid her monthly mortgage payments to Chase Manhattan Bank through an automatic bank draft.  In July 1998, MidFirst purchased a group of mortgages from Chase, including David's loan.  In August 1998, MidFirst assigned the servicing of the loan to MMC.

In anticipation of the transfer, MMC sent David a letter on July 15, 1998, informing her that MMC would be collecting her payments and that she could mail her monthly payments to MMC.  On July 20, 1998, MMC sent her a second letter, informing her that payments made after August 1, 1998, could be mailed to MMC or could be automatically drafted from her checking account.  To institute the automatic draft, David was instructed to complete the form enclosed in her MMC payment-coupon booklet.  The automatic drafting authorization provided, in material part:

> I authorize Midland Mortgage Co or assigns to charge my mortgage payments to my bank account as shown above.  I also request my "Bank" specified above to honor the debits initiated by Midland Mortgage Co.  I understand that the funds will be withdrawn on my due date and that it is my responsibility to ensure sufficient funds are in my account at that time.

On or about July 23, 1998, David filled out the form, signed it, and mailed it to MMC with a sample check or deposit slip providing the bank and account routing information.  The form did not provide a space in which to write the amount of the monthly mortgage payment to be drafted, but did include spaces to fill in amounts for drafting "Add'l Monthly Principal" and "Add'l Monthly

4

Escrow." David filled in a space with her monthly payment amount next to the words "Add'l Monthly Principal." She wrote the amount once and, because she thought the amount might be illegible, wrote the amount again in parentheses. She returned the completed form in the same envelope in which she sent a check for her August payment in the amount of $297.95. The check cleared her bank on July 31, 1998.

On August 12, 1998, David received a letter acknowledging receipt of the automatic drafting authorization and informing her that her September 1998 payment would be automatically withdrawn on the due date of her payment.[1] On August 31, 1998, however, defendant MidFirst Bank attempted to draft two payments of $297.95 from David's account, apparently with the understanding that plaintiff wished not only to have her monthly mortgage payment drafted, but also a like amount of "add'l monthly principal." The draft used an incorrect routing number, and MidFirst was notified on August 31 that the draft was rejected due to a routing error. There is no evidence that David was informed of this attempt at drafting her account, and no evidence that any money was taken from her account at that time.

On or about September 14, 1998, after obtaining a correct routing number for the plaintiff's SouthTrust account, MidFirst, acting on behalf of MMC, drafted David's account for $595.90, again apparently concluding that plaintiff wished to pay her mortgage payment plus a like amount in additional principal. An MMC spokesperson, Stephanie Leak, testified that the September 14 draft was to "replace" the September 1 draft that had been rejected because of the incorrect routing number. On September 17, David did not have sufficient funds in her SouthTrust account to cover

---

[1]     It is not clear when David's payment was due, but it appears that it was due on the first of each month.

the $595.90 draft, so the bank rejected it.[2]  For some reason not known, David was notified by SouthTrust that the draft was "paid" (when, in fact, it was not), and, further, that she had overdrawn the account due to the draft and that she would be assessed a fee of $24.  In the meantime, MMC credited plaintiff's mortgage account with payment of the September monthly payment plus $297.95 toward additional principal.

When David learned that her account had been "drafted" $595.90,[3] she contacted MMC by phone, complaining that MMC had drafted her account for more than her monthly mortgage payment.  An MMC spokesperson told David that the draft of $595.90 was "just a mistake," and that the error would be straightened out and "it wouldn't happen again."  David believed MMC had received $595.90 from her account at that time (when it actually had not), and that SouthTrust was charging her a $24 fee for the insufficiency.

David received the following letter from MMC, dated September 18, 1998:

Dear Ms. David:

Thank you for your recent inquiry concerning the above referenced loan with Midland Mortgage Co.  We appreciate the opportunity to be of service.

_____

[2]    The fact that the draft was not paid by SouthTrust is established by plaintiff's October 14, 1998, bank statement. (Exhibit 9 to David I Deposition).  Although the statement shows a draft on October 1 for $297.95 and a $24.00 insufficient funds charge on September 18, there is no debit reflected for $595.90 during the entire month.  Thus, despite the notice from SouthTrust saying the draft was "paid," it was never withdrawn from her account.

[3]    Keep in mind that, in fact, the draft had been rejected and that no money had been taken from her account even though the notice she received from SouthTrust Bank indicated incorrectly that the draft was "paid." (See Exhibit 5 to David I Deposition).

Midland Mortgage Company inadvertently drafted the September 1998 payment twice from your bank account.  The funds will be returned via wiring on the afternoon of Tuesday, September 22, 1998.  We apologize for any inconveniences that have occurred.

If you have any questions concerning your loan, please call our Customer Service Department at 1-800-654-4566.

MMC did not return the funds via wiring on September 22, 1998, as the letter stated.  Rather, on September 24, 1998, MMC learned that the $595.90 draft of September 14 had not been paid because of insufficient funds in David's account.  Even so, on September 25, 1998, MMC reversed the "additional principal" portion of the draft and deposited $297.95 into David's account.  On October 1, 1998,  Midfirst, again acting for MMC, drafted $297.95 from David's account for her October payment.  Then, on October 5, 1998, apparently believing the September "overdraft" had not been refunded (when it had been), MMC made a second deposit of $297.95 into David's account.

On October 9, 1998, MMC wrote David another letter, stating:

Dear Ms. David:

Thank you for your recent inquiry concerning the above referenced loan with Midland Mortgage Co.  We appreciate the opportunity to be of service.

Our records indicate that funds totaling $595.90 were automatically withdrawn from your bank account on September 1, 1998, and applied as follows: $297.95 to your September 1, 1998 monthly payment, and $297.95 to your principal balance.

On September 18, 1998, a payment reversal was made on the funds of $297.95 that were applied to your principal balance, and the said funds were deposited back in your bank account.

On October 1, 1998, funds of $297.95 were automatically withdrawn from your bank account and applied to your October 1, 1998 monthly payment.

The above referenced double drafting of your bank account on September 1, 1998, was an error, for which Midland Mortgage Co. apologizes. If you have been assessed a fee by your bank arising from the above referenced double drafting, please forward a copy of the bill or bank statement to our office for reimbursement.

Your loan is next due for the November 1, 1998 monthly payment.

If you have any further questions, please call our Customer Service Department at 1-800-654-4566, extension 800.

Despite the date of the letter, it does not mention the October 5 "refund."

At that point in time, the following appears to be the state of the facts. David's September 1 mortgage payment actually had not been made, although MMC's records reflected that it had been paid. Further, not only had $595.90 not been drafted from David's account, MMC deposited that amount into her account to "refund" drafts that were never completed. Thus, as of October 9, 1998, plaintiff still owed $297.95 to MMC for her September mortgage payment and $595.90 more for "refunds" (September 25 and October 5) made by MMC that were not necessary because the drafts they were intended to refund were never completed.

After receiving her bank statement dated October 14, 1998, David saw that the amount of $297.95 had been withdrawn from her account for her October payment, not by MMC, but by MidFirst. She had never heard of MidFirst, and called MMC to ask if they knew "who MidFirst was." She talked to several people at MMC's customer service number, but none could answer her question. On October 23, 1998, MMC mailed David a check for $24 as reimbursement for "the overdraft charge in September 1998 caused by a Midland Mortgage Co. error." David testified that

MMC actually sent her two checks, each for $24, but that she cashed only one because cashing the second check "wasn't the right thing to do."

On November 2, 1998, MidFirst drafted $297.95 from David's account to pay her November payment.

On December 1, 1998, MidFirst drafted $297.95 from David's account to pay her December payment.

On January 4, 1999, MidFirst drafted $297.95 from David's account to pay her January payment.

During January 1999, MMC began to discover the errors that had been made. On January 27, 1999, MMC (not MidFirst) drafted $595.90 from David's account and, on the same day, drafted an additional $297.95.[4] Just three days later, on February 1, 1999, MidFirst drafted another payment of $297.95 from David's account for her February mortgage payment. Ultimately, the drafts initiated by MMC for $297.95 and $595.90 were stopped or reversed, and the funds returned to plaintiff's account a month later, on February 26 and March 3, 1999. (See Exhibit 10, page 9, of David I Deposition). These transactions were not noted in MMC's records, however, until March 17 and March 24. (See Exhibit 14 to Leak Deposition).

---

[4]    Of course, these numbers correspond with what David apparently owed. The $595.90 draft attempted to get back the "refunds" erroneously made on September 25 and October 5, while the $297.95 covered the September 1 mortgage payment that actually had never been paid due to the confusion of drafts and refunds.

On March 1, 1999, MidFirst drafted $288.33[5] from David's account to pay her March payment. There is no indication in plaintiff's bank account records that this draft was refunded or otherwise returned by MMC or MidFirst. As of early March, MMC considered David's account to be current. On March 24, 1998, however, MMC "reversed" the credit for David's September payment, showing for the first time in its records that the September payment still was owed. David was not notified of the "reversal" of the September payment until she received a letter dated June 23, 1998.

At some time around March 1, the automatic draft method of payment was stopped.[6] On April 12, 1999, plaintiff mailed MMC a check for $288.33 to pay her April payment, but on April 19, 1999, MMC returned the check, and informed David that her outstanding balance, including late charges and fees, was $1,227. Also in April, MMC reported to credit reporting agencies that David's account was $1,227 past due and that a payment was more than 90 days late.

In early May, David again mailed MMC a check for $288.33. MMC returned the check, stating: "Based on the delinquency status of your loan, we are returning the enclosed partial payment." The letter further notified David that her outstanding balance was $1,525.87, and requested that she mail the full amount. On May 11, 1999, MMC's Loss Mitigation Department notified David she needed to take steps to "avoid foreclosure" and advised her of assistance programs to help her sell her home, deed the property to the FHA, or repay her loan.

---

[5]     During February 1999, a change in the escrow account lowered David's monthly mortgage payments to $288.33.

[6]     David testified that MMC notified her that they could no longer draft money from her account, and that she agreed she would simply mail them a check each month.

10

David wrote the following letter to MMC:

Dear Sirs or Computer!

In Aug. 1998 you acquired my morgage[sic].  For the first month I paid by check.  Then we made arrangement for you to withdraw the payment from my bank at the rate of $297.95.  That's when the trouble started!

I'm sending a copy of my bank statements.  As you will see, either someone or the computer has been playing with my account and if either of you can add(?) You are one payment ahead.

I talked to Pam last week and she said I was 6 months behind - how?  (See enclosed).

I need a letter from you saying I'm not behind, it's your fault and my credit is still good.

My health is something else.  If you had your account played with has[sic] mine has been, you would have trouble [indecipherable] isn't good and all this has been very detrimental to my health.

If you cannot or will not get this straightened out, I shall be forced to contact a lawyer.

I need a letter addressed to "whom it may concern," so I can send it to the person who I hope will refinance my house, then you and the computer can mess up someone else['s] account.

On May 20, 1999, MMC wrote David the following letter:

Dear Mortgagor(s):

We have received the documentation needed to research your payment in question.  Please allow 30 days for the research to be completed.

Any late charges assessed, as a result of errors by Midland Mortgage Co. or a previous servicer, will be waived.  Your loan will not be reported as delinquent during the research period.  If previous months were reported delinquent as a result

11

of Midland Mortgage Co. or previous servicer error, we will notify the credit bureaus to correct this information upon completion of our research. We will notify you with the results of our research as soon as possible.

Although we are making every effort to resolve your payment question, you may continue to receive late payment notices. This does not indicate we are reporting your loan as delinquent to the credit bureaus; our intent is to provide you with the monthly status of your account.

For expedited payment processing, please continue to send your payment with a payment coupon to:

Midland Mortgage Co.
P.O. Box 268888
OKC, OK 7312608888

Thank you for taking the time to bring this matter to our attention and for providing the check copies needed to complete our research. We apologize for any inconvenience this has caused. If you have any questions, please contact the Customer Service Department at 1-800-654-4566, Monday through Friday, 8:00 am to 6:00 pm central time.


On May 21, 1999, David sent a typed letter to MMC, stating:


To Whom it may concern:

I received a letter from your company indicating that I am in arrears regarding my mortgage loan #0041188264.

Please find enclosed a summary of my records of payment as indicated by my monthly bank statements and the corresponding statements. You will find that since you acquired my loan in July of 1998, my payments have been made as scheduled; however, your company has, on several occasions, attempted to draft additional, unauthorized payments from my account.

My bank statement records indicate that on January 27th of this year, two drafts were made by your company from my account for $595.90 and $297.95 respectfully[sic]. These drafts were paid but were not authorized or credited to my mortgage loan.

My records further indicate that your company attempted to withdraw $297.95 from my account on March 1st and another $595.90 shortly thereafter. These transactions were revoked because the payment for March 1st of $288.33 had already been pulled. You may refer to my March bank statement to verify this activity.

According to my records, I am fully paid on my mortgage through June of 1999 due to the extra withdrawals that were made form[sic] my account in January.

I am requesting that your records be updated immediately to reflect the timely payment of my mortgage loan. If you have reported negative information concerning my account to any credit reporting agencies, I expect a letter of correction to be sent to protect my credit rating. I am also requesting a copy of your tax reporting records after this matter has been resolved in order to assure that my interest payments have been recorded accurately.

Please contact me when you receive this letter to verify that this matter will be resolved as soon as possible.

On June 23, 1999, MMC wrote David the following letter:

Thank you for taking the time to bring this matter to our attention. We have completed the research on the above referenced loan with Midland Mortgage Co.

Our records indicate the September 1, 1998, payment was received and credited September 1, 1998 along with an additional $297.95 as principal curtailment payment. On September 24, 1998, at your request, Midland Mortgage Co. credited your bank account for the $297.95. Having not realized this was already taken care of, we again credited your bank account for $297.95 on October 5, 1998 in error.

On January 27, 1999, a manual draft of $595.90 was to recover funds originally applied September 1998 that were returned by your bank as invalid routing information. The manual draft of $297.95 was to recover the mistaken credit originally deposited October 5, 1998. Further review of your loan indicated the March 1, 1999 draft for $297.95 was returned to you on March 17, 1999. In addition, funds for $595.90 were returned to you on March 24, 1999. Your check #997 was returned to you for the full amount due on April 19, 1999. Check #1006 was returned for the full amount due on May 14, 1999. Check #1028 was returned to you for the full amount due on June 9, 1999.

13

> Currently, your loan is due for the January, February, March, April, May and June 1999 payments.  To speak with representatives regarding your payments, please call toll free 1-800-552-3000.
>
> If we can be of any further service, please contact our Customer Service Department at 1-800-654-4566.

David put the funds from the checks that had been returned to her from MMC into a separate bank account at Regions Bank, because she felt that the money was MMC's money, they just "wouldn't take it."  On July 19, 1999, an attorney for MMC notified David that her home was going to be foreclosed in the next 60 to 90 days.  David hired an attorney, who apparently negotiated with MMC in order to prevent the foreclosure from moving forward.   In the spring of 2000, David paid a lump sum to MMC of $4,639.54, the amount MMC claimed she owed to bring her mortgage current.  She has since continued to make monthly mortgage payments.

On June 30, 2000, David filed the complaint commencing this action.  Her brief complaint set forth state-law claims of breach of contract, fraud, and intentional infliction of emotional distress (known in Alabama as the tort of outrage).  On September 7, 2000, having sought leave to amend and that motion having been granted, plaintiff filed an amended complaint setting forth additional allegations relating to damages and to her fraud claim.  She also added a libel claim, asserting that the defendants conspired to submit erroneous credit information about her to credit reporting agencies.  The defendants' motions for summary judgment seek dismissal of all of these claims.

14

## III. DISCUSSION

### A. Breach of Contract

The defendants seek summary adjudication in their favor on plaintiff's claims of breach of contract. MidFirst asserts that it was not a party to the contract at issue. MMC asserts that it did not breach the contract to draft David's account.

Under Alabama law, a plaintiff asserting a breach of contract[7] claim must prove: (1) the existence of a valid contract binding the parties; (2) plaintiff's performance under the contract; (3) the defendant's non-performance; and (4) damages resulting from the non-performance. See Ex parte Steadman, 812 So. 2d 290, 293 (Ala. 2001). In this case, MMC does not dispute that the form authorizing the draft from David's account constituted a contract between David and MMC. MidFirst does dispute that it was a party to the contract, and the court agrees that plaintiff has not demonstrated that she had a contractual relationship with MidFirst.[8] Alternatively, even assuming MidFirst was a party to the contract, it (as distinct from MMC) did nothing to breach the contract. The payment history recounted above makes clear that all MidFirst did was to draft plaintiff's account for payment of her monthly mortgage payments. Only for the September payment did

---

[7]    The defendants do not dispute the existence of a contractual agreement between plaintiff and, at least, MMC, embodied in the authorization for automatic drafting signed by plaintiff and returned to MMC. The court will assume for purposes of this motion that the authorization constituted a binding contractual agreement, although it is not clear what duties it imposed on MMC.

[8]    MidFirst's role appears to have been that of an agent with responsibilities for carrying out certain contractual obligations on behalf of the principal, MMC. The plaintiff does not cite any authority for holding MidFirst liable for MMC's breach of contract, and the court finds none. To the contrary, where an agent enters into a contract on behalf of a disclosed principal, generally it is only the principal who is bound. See, e.g., Davis v. Childers, 381 So. 2d 200, 202 (Ala. Civ. App. 1979), cert. denied, 381 So. 2d 202 (Ala. 1980).

MidFirst draft the account for more than the regular monthly payment, and that was the product of a misunderstanding concerning plaintiff's instructions on the drafting form which appeared to request that "add'l principal" in the amount of $297.95 be drafted.[9] Once that misunderstanding of the terms of the drafting agreement were clarified, MidFirst thereafter drafted *only* the regular mortgage payments. Although it was that misunderstanding that caused the recurring problems between plaintiff and MMC, it was not itself a breach of the agreement because, on the face of the draft authorization form, plaintiff instructed that "add'l principal" be drafted, even if she did not comprehend what that actually meant in terms of her monthly payments. Clearly, MidFirst complied with the instructions it received from plaintiff per the authorization form until plaintiff made clear that she intended only to have her regular monthly payment drafted.

In any event, the effort by MidFirst to draft the monthly payment and additional principal in September failed, first because of an incorrect routing number, and later because there were not sufficient funds in the account to cover both the monthly payment and the additional principal. It is clear that no money was actually drafted from plaintiff's account as a result of either of these efforts in September. MidFirst did not breach the drafting agreement because it did not successfully draft too much money. Nor did it breach the agreement by failing to draft enough money to cover the regular payment because there is nothing in the draft authorization form creating a duty on the part of either MidFirst or MMC to use the automatic drafting procedure to ensure that plaintiff's

---

[9]     It could be argued that no contract existed to this point as there was no "meeting of the minds" concerning the crucial terms of the agreement. Plainly, while plaintiff believed the authorization form directed the drafting of only her regular monthly mortgage payment, MMC and MidFirst understood it to request payment of an additional principal payment. Thus, until that misunderstanding was resolved, there was no mutual assent, or "meeting of the minds," concerning the actual terms of the agreement.

monthly mortgage payment was made.  The responsibility for making sure the monthly payment was made always remained with the plaintiff.[10]  Thus, MidFirst did not breach any contract with plaintiff to which it might have been a party, and its motion for summary judgment is due to be granted on this theory.

As for MMC, plaintiff has demonstrated that she entered into a contract by which defendant MMC (or its assign, MidFirst) was to draft from her account the amount of her monthly payment on the first of each month.  Although the contract itself is somewhat limited in terms of the method by which the payments would be drafted, all of the evidence indicates that MMC and David clearly agreed that her account would be drafted in the amount of $297.95 on the first of each month, unless her mortgage was in arrears or prepaid.  Also clear is the fact that the agreement was to draft her account only for "mortgage payments."  Its expressed terms provided authorization "to charge my *mortgage payments* to my bank account...." [Italics added].  Between September 1998 and January 1999, MMC initiated no drafts, all of which were handled by MidFirst.  When the initial error concerning the September payment  and MMC's *refunds* to plaintiff's account were discovered in January, MMC for the first time initiated two drafts on January 27, 1999, one for $297.95 and the other for $595.90, to get the unpaid September mortgage payment and to recover the $595.90 mistakenly refunded to her.  Even assuming the draft in the amount of $297.95 for the late, unpaid September mortgage payment was consistent with the draft agreement, it is clear that the draft to

_____

[10]     The  draft  authorization  form  expressly  stated  that  "Nothing  contained  in  this Agreement is intended to relieve the borrower(s) from their obligations under the loan documents...." Consequently,  because  the  duty  to  make  the  monthly  mortgage  payment  arose  under  the  "loan documents," the authorization did not shift the responsibility for assuring that payment from plaintiff to defendants.

recover the mistaken refund was *not* authorized by the agreement. The attempt by MMC to recover the mistaken refund, while understandable, was not authorized by the drafting agreement and, thus, was a breach of its terms.

For the reasons set forth above, MidFirst's motion for summary judgment on the contract claim is due to be granted, but MMC's motion on the contract claim is due to be denied based on MMC's drafting of plaintiff's account to collect a debt (the mistaken refund) not authorized by the agreement to be collected by drafting the account.

## B. Fraud

The defendants seek summary judgment on plaintiff's fraud claims. MMC asserts that plaintiff's allegations set forth only a promissory fraud, and that plaintiff has failed to offer evidence of the requisite intent to deceive. MidFirst adopts MMC's arguments and further asserts that plaintiff has not alleged that MidFirst made any false statements to her.

Under Alabama law, to support a claim of fraudulent misrepresentation, the plaintiff must demonstrate that the defendant made "(1) a false representation, (2) of an *existing* material fact, (3) that was reasonably relied upon, and (4) damage resulting as a proximate cause." Wheelan v. Sessions, 50 F. Supp. 2d 1168, 1172 (M.D. Ala. 1999) [italics added]. Generally, a claim of fraud cannot be based upon the defendant's expression of an opinion or a prediction of future events. See, e.g., Wade v. Chase Manhattan Mortgage Corp., 994 F. Supp. 1369, 1378-79 (N.D. Ala. 1997) aff'd, 132 F.3d 1461 (11th Cir. 1997). Such opinions or predictions simply are not statements of *existing* fact upon which individuals have the right to rely. Crowne Investments, Inc. v. Bryant, 638 So. 2d 873, 877 (Ala. 1994). Similarly, claims that a party has misrepresented its "promise to act or not to

18

act in the future" is deemed to be a promissory fraud.  A claim of promissory fraud must be supported by proof of two additional elements: (1) that the defendant had no intention at the time of the promise of performing the act promised, and (2) that the defendant had an intention to deceive. See Ex parte Michelin North America, Inc., 795 So. 2d 674, 678-79 (Ala. 2001).  The failure to perform a promised act is not in itself evidence that the actor intended to deceive at the time of the promise.  See Campbell v. Naman's Catering Inc., ___ So. 2d ___, 2002 WL 1880535 (Ala., Aug. 16, 2002).  Otherwise, "any breach of contract would constitute a fraud."  Goodyear Tire & Rubber Co. v. Washington, 719 So. 2d 774, 776 (Ala. 1998).

In this case, David alleges that MMC misrepresented that it would draft her account on the due date for the amount of her monthly payment.  David's complaint is that MMC promised to act in a certain manner with respect to drafting her account, and that it failed to do so.  While she states that MMC acted "intentionally," she offers no evidence from which a reasonable juror could find that, at the time the promise was made, MMC had no intention of properly drafting her account. Compare Campbell, 2002 WL 1880535 at *2-3 (holding that jury question existed where plaintiff submitted affidavits of several of defendant's employees, which indicated that defendant had a practice of promising to withhold money from paychecks to pay insurance premiums and fund Christmas Club accounts, but would cease applying the money properly after some time).  In this case, David has offered no evidence that defendant MMC intended to deceive her at the time it promised to draft her account on a monthly basis; accordingly, the statements cannot give rise to a claim of fraud under Alabama law.

19

Defendant MidFirst asserts that plaintiff has failed to allege that MidFirst made any false representations to the plaintiff. The court agrees. Plaintiff admits she had no contact with MidFirst until foreclosure was threatened.

Accordingly, the defendants' motions for summary judgment on David's claims for fraud are due to be granted.

### C. Outrage

The plaintiff states a claim based on Alabama law for the tort of outrage. The tort first was recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980). Since then, the Alabama Supreme Court repeatedly has made clear that a remedy is reserved for only the most egregious conduct, conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1044 (Ala. 1993). As discussed in relation to plaintiff's other claims, defendants' conduct in this case is not "extreme" or "outrageous" as would support a claim of outrage. Compare Gray v. Liberty National Life Insurance Co, 623 So.2d 1156, 1160 (Ala. 1993)("mistaken" automatic drafts to pay insurance premiums, which were later refunded with interest, were not so outrageous as to support a claim for outrage). Accordingly, the defendants' motions for summary judgment on the claim of outrage are due to be granted.

### D.  Libel

MMC and MidFirst argue that they are entitled to summary judgment in their favor on plaintiff's libel claim for two reasons: (1) that the credit report was true; and (2) that plaintiff failed to plead that the credit report was made with malice.  In addition, MidFirst asserts that it is entitled to summary judgment because it did not make the complained-of credit reports.

Under Alabama law, a plaintiff asserting a defamation claim must establish that the defendant intentionally made a false statement about plaintiff to a third party, that the statement was not privileged, and that the statement injured plaintiff's reputation and caused plaintiff to suffer damages.  Borden v. Clement, 261 B.R. 275, 283 (N.D. Ala. 2001), aff'd, ___ F.3d ___, 2002 WL 833295 (11th Cir. April 16, 2002).  A statement is defamatory if it tends to harm the reputation of the plaintiff or to deter third persons from associating or dealing with her.  U.S. Steel, LLC, v. Tieco, Inc., 261 F.3d 1275, 1315 (11th Cir. 2001).  Truth is an absolute defense to a claim for libel or slander.[11]  See Hughes v. Cooper Tire Co., 76 F. Supp. 2d 1312, 1315 (M.D. Ala. 1999); Deutcsh v. Birmingham Post Co., 603 So. 2d 910, 911 (Ala. 1992), cert. denied, 113 S. Ct. 976, 506 U.S. 1052, 122 L. Ed. 2d 130 (1993).

A qualified privilege exists in the area of credit reporting.  See, e.g., Moore v. Beneficial Nat'l Bank, 876 F. Supp. 1247 (M.D. Ala. 1995).  A qualified privilege exists where a party makes a communication that is prompted by a duty to the public or a third party who has a corresponding interest, if the communication is made in good faith and without actual malice.  Marshall v. Planz, 13 F. Supp. 2d 1246, 1251 (M.D. Ala. 1998).  Good faith and actual malice, however, are not

---

[11]     The instant case is one for libel because the alleged defamation was by written words. Slander applies to a defamatory oral communication.

considered two separate elements. Ex parte Blue Cross and Blue Shield of Alabama, 773 So. 2d 475, 478 (Ala. 2000). "Rather, the term good faith was intended as the opposite of the term actual malice." Id. Acting in good faith equates with acting without actual malice. Id. Malice may be proven by a showing of ill will or hostility, but also may be demonstrated by a showing that the statement was made with knowledge of its falsity or with reckless disregard for the truth of the statement. Hayes v. Wal-Mart Stores, Inc., 953 F. Supp. 1334, 1341 (M.D. Ala. 1996).

In this case, the plaintiff asserted in her amended complaint that the defendants intentionally conspired to disseminate erroneous credit information. While plaintiff does not use the word "malice," the court finds that the complaint is sufficient to plead a malicious defamation.

As to MidFirst, plaintiff pled only that MidFirst "conspired" with MMC to make the false report. There is no evidence to support this claim, and MidFirst's motion for summary judgment as to the libel claim is due to be granted.

MMC has pleaded the affirmative defenses of truth and qualified privilege. The facts appear to be undisputed that, at the time MMC reported on plaintiff's mortgage account to credit reporting agencies in April 1999, plaintiff's September 1998 payment had not been made (albeit in large measure due to errors made by MMC), that MMC's efforts on January 27, 1999, to collect the September payment and the mistaken refunds by drafting plaintiff's account were stopped and the money refunded to her in March 1999, and that plaintiff actually owed to MMC $297.95 (for the September 1998 payment) and $595.90 (for refunds mistakenly made to her account), for a total of $893.85. When MMC rejected the April mortgage payment of $288.33, the total that was due went to at least $1,182.18 (not including any proper late fees and interest).

It also is undisputed, however, that until late March 1999, MMC's mortgage account records for plaintiff showed the September payment as having been made, although it was known from at least January 27, 1999, that it had not been made. After it refunded the drafts made on January 27, 1999, MMC reversed the credit reflected for the September payment on its mortgage records on March 23, 1999, showing for the first time that the September payment was unpaid and in arrears. It was not until two full months later, however, that MMC sent a letter dated June 23, 1999, to plaintiff explaining that her September mortgage payment was never actually paid. Indeed, in a letter dated October 9, 1998, MMC acknowledged the refund of $297.95 drafted erroneously for "add'l principal," but said nothing about the fact that her regular September mortgage payment had not been received. In fact, the letter at least implied that plaintiff's account was current as of that date, leading plaintiff to believe, mistakenly, that her September payment was made.

The credit report made by MMC was essentially true. In April 1999, the September 1998 payment had been unpaid for more than ninety days, although it seems hardly fair to lay it entirely at plaintiff's feet, given the errors made by MMC both in "double" refunding the September draft[12] and in failing to explain for so many months that the September payment had not been made. Similarly, the report that plaintiff's account was $1,227.00 in arrears was essentially correct, even

_____

[12]     It must be remembered that, in fact, neither MMC nor MidFirst ever received *any* funds for the September payment. After the August 31 draft was rejected due to incorrect routing numbers, the September 18 second try at drafting the account was rejected due to insufficient funds to cover the size of the draft. Notwithstanding the fact that MMC later "refunded" plaintiff's account, no money was ever received by MMC or MidFirst on either attempt to draft plaintiff's account for the September payment. Examination of plaintiff's September and October SouthTrust Bank statements confirms that, although she received refunds from MMC, the only draft *withdrawing* money from her account was by MidFirst on October 1, for the October payment. No money was ever successfully drafted for the September payment.

if one might quibble over a few dollars.  It is clear that by April 1999, plaintiff owed MMC almost $1,200, without taking into account any late fees or additional interest charges against the late payments.  Once the attempts to draft plaintiff's account to collect the September payment were stopped, defendant MMC had little choice but to show the missed payment on its records and to report it to credit reporting agencies.  Because the information supplied by MMC was essentially correct, MMC is entitled to summary judgment on plaintiff's libel claim.

Even if one could argue that the information reported by MMC was not correct, defendant still would be entitled to summary judgment based on a qualified immunity.  Ex parte Blue Cross and Blue Shield of Alabama, 773 So. 2d 475 (Ala. 2000).  Although defendant has the initial burden of pleading and proving the applicability of the privilege, it has done so here.  The report to credit reporting agencies was "one in which the party has an interest," and it was "made to another having a corresponding interest."  Ex parte Blue Cross and Blue Shield of Alabama, 773 So. 2d 475, 479 (Ala. 2000).  The burden, therefore, shifts to the plaintiff to present substantial evidence from which a reasonable jury could conclude that MMC acted with actual malice.  Id. at 478.  To do so, plaintiff must present evidence to support an inference that MMC knew that what it was reporting was false, or at least that MMC recklessly disregarded whether it was true or false.  Hayes v. Wal-Mart Stores, Inc., 953 F. Supp. 1334, 1341 (M.D. Ala. 1996).

There simply is no such evidence in this case.  Not only was the report true that the September payment was more than 90 days late, it was in fact unpaid at the time the report was made.  Although it is true that MMC's records showed the payment as having been made until as late as March 23, 1999, the evidence remains undisputed today that, in fact, it had not been paid.  Even

though MMC made several errors in handling plaintiff's account and in responding to her inquiries about the discrepancies in her account, it cannot be said that MMC *knew* what it reported was false or that MMC *recklessly* disregarded whether it was true. The mere falsity of the information does not establish the requisite malice; there must be additional evidence from which it can be inferred that the defendant acted with ill-will or with knowledge of the falsity of the information. That additional evidence simply is not here. MMC is entitled to summary judgment on plaintiff's libel claim.

## IV.  CONCLUSION

Defendant MidFirst's motion for summary judgment is due to be  granted in its entirety. Defendant MMC's motion for summary judgment is due to be granted with respect to all claims except plaintiff's breach of contract claim, as to which the motion for summary judgment is due to be denied. A separate order will be entered in accordance herewith.

DATED this 29th day of _October_ , 2002.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE